OPINION *Page 2 
{¶ 1} Defendant-Appellant, Devonne L. Petaway, appeals the judgment of the Logan County Court of Common Pleas convicting him of aggravated burglary, aggravated robbery, felonious assault, abduction, and possession of weapons while under disability. On appeal, Petaway asserts that the trial court erred in finding several juvenile witnesses competent to testify and that his convictions are against the manifest weight of the evidence. Based upon the following, we affirm the judgment of the trial court.
 {¶ 2} In February 2008, the Logan County Grand Jury indicted Petaway on one count of aggravated burglary in violation of R.C. 2911.11(A)(2), a felony of the first degree, with a firearm specification under R.C. 2929.14(D)(1)(a)(ii); one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a felony of the first degree, with a firearm specification under R.C. 2929.14(D)(1)(a)(ii); one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, with a firearm specification under R.C. 2929.14(D)(1)(a)(ii); one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; and, one count of having a weapon while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree. The indictment arose from an incident during which it was alleged that Petaway pushed his way into a home, brandished a firearm, demanded money, pointed the firearm at a child, struck a woman with *Page 3 
the firearm, and fired shots at a man who attempted to flee the home. Subsequently, Petaway entered a plea of not guilty as to all counts in the indictment.
 {¶ 3} In August 2008, the case proceeded to trial at which the following testimony was heard.
 {¶ 4} Tisha Lyburtus, the female victim, testified that, in January 2008, she lived at 313 South Park Street in Bellefontaine; that, on January 10, 2008, she and her boyfriend, Keith Brown, her son, Aurelio Lyburtus, and her two nephews, Skylar Rogan and Desmond Lyburtus, were at her home; that Brown and the boys were playing video games in the living room of the home while she was in the kitchen; that she heard a loud bang at the door and Brown went to see who it was; that she heard someone yell "[g]et the fuck on the floor, [g]et down and give me your money" (trial tr., p. 132); that she saw Petaway with a gun; that she recognized Petaway because he had dated her cousin, Kyna Brown; that Petaway told her to "shut up" and "get the fuck on the floor," so she cradled Aurelio and Skylar in her lap on the floor while Desmond remained on the couch (trial tr., p. 133); that a tall white man held a knife against Brown and told him to empty his pockets; that Petaway pushed Desmond up against the couch and pressed the gun against his eye; that she asked Petaway to leave the child alone, and he replied "[s]hut the fuck up, bitch" and struck the back of her head with the gun (trial tr., p. *Page 4 
137); that he then hit her hand with the gun as she attempted to block him; that she did not see Petaway or the white man take any money, but she believed they took $40 because it was missing; that Brown told the men that he had some money outside in his truck, feigned reaching for his keys, knocked the white man out of the way, and ran out the front door; that both the white man and Petaway ran after Brown, and Petaway stood in the doorway and fired shots at Brown; that she heard several more gunshots as she barricaded herself and the children in a bathroom and called 9-1-1; and, that medical personnel called to the scene recommended she go to the hospital to receive further medical treatment, but that she did not go to the hospital because she was concerned about the children.
 {¶ 5} Keith Brown testified that he was present during the incident at Lyburtus' home; that he was playing video games with Lyburtus' son and nephews when he heard someone bang on the door; that three men "barged" their way into the home and demanded money; that the tall white man backed him into a corner and held a knife against him; that he recognized one of the other men as Petaway because Petaway had dated Lyburtus' cousin, Kyna Brown; that Petaway yelled at everyone inside the home to get down; that Petaway hit Lyburtus in the head with a gun; that Petaway held a gun to Desmond's eye; that he told the men that his money was in his truck and was able to push the white man out of the way *Page 5 
and run out the door; that Petaway fired four or five shots at him as he ran; and, that he was not hit by any of the shots.
 {¶ 6} The trial court conducted an in-chambers voir dire examination of Skylar, during which Skylar stated that he turned eleven years old on July 30, 2008; that he believed he was present in court because he "was staying at his cousin's house and [they] got robbed" (trial tr., pp. 177-78); that he could not remember how to recite the Pledge of Allegiance; that he did not know what happened to people who did not tell the truth; that he had been around people who had been caught telling a lie, and they got into trouble; that a lie is "where someone don't tell the truth"; that he thought he would be punished if he did not tell the truth; that, if he was asked to tell the truth, he would do it because he would not want to get in trouble; and, that lying is bad. Thereafter, Petaway objected to Skylar's testimony on the basis of competency due to his age, which the trial court overruled.
 {¶ 7} Skylar testified at trial that, on the night of the incident, he was playing video games with his cousins when they heard someone knock on the door; that, when Brown attempted to open the door, a white man and a black man kicked down the door and the black man held a gun to Desmond's eye; that he sat on the floor with Aurelio and Lyburtus; that Lyburtus told the black man, "please don't kill my nephew," and the man hit her in the back of the head with the gun; *Page 6 
that the white man had a knife in his hand and was in the corner with Brown; that Brown pushed the white man aside and ran outside; that the black man started shooting and ran outside; and, that Lyburtus put the boys in the bathroom while she called the police.
 {¶ 8} The trial court conducted an in-chambers voir dire examination of Aurelio, during which he stated that he turned eleven years old on July 29, 2008; that he believed "to tell the truth" means "to be honest"; that it is a bad thing to lie, and people usually get in trouble for lying; and, that it is important to tell the truth. Thereafter, Petaway objected to Aurelio's testimony on the basis of competency due to his age, which the trial court overruled.
 {¶ 9} Aurelio testified at trial that, on the night of the incident, he was playing video games with his cousins; that a black man and a white man "busted in the door" (trial tr., p. 222); that the white man had a knife and held Brown in a corner; that the black man held a gun and put it on Desmond's face; that the black man hit Lyburtus on the back of the head and on the knuckle with the gun; that Brown pushed the white man and ran out the door; that the black man started shooting and ran outside along with the white man; that Lyburtus put the boys in the bathroom; and, that he had seen the black man before and recognized him as Petaway. *Page 7 
 {¶ 10} The trial court conducted an in-chambers voir dire examination of Desmond, during which he stated that he turned nine years old on July 14, 2008; that "if you lie to your parents and your parents find out you're going to get in trouble, but if you tell the truth you're probably not going to get in trouble" (trial tr., p. 205); and, that he would be willing to tell the truth under any circumstances. Thereafter, Petaway objected to Desmond's testimony on the basis of competency due to his age, which the trial court overruled.
 {¶ 11} Desmond testified at trial that, on the night of the incident, he was playing video games with his cousins; that a white man and a black man knocked on the door and then "started busting in" (trial tr., p. 231); that the men told everyone to get down on the floor, but he remained on the couch; that the white man had a knife and pushed Brown against a wall; that the black man put a gun against his face and he was scared; that the black man hit Lyburtus on the back of the head with the gun; that Brown pushed the white man and ran outside; that the black man ran to the door and started shooting and chasing Brown; and, that Lyburtus put the boys in the bathroom and called the police.
 {¶ 12} Patrol Officer Dennis McBrien of the Bellefontaine Police Department testified that, on January 10, 2008, he was dispatched to a robbery in progress at 313 South Park Street in Bellefontaine, Logan County; that Lyburtus, Aurelio, Desmond, and Skylar were at the residence and were very distraught; that *Page 8 
Lyburtus' head was bleeding; that Lyburtus identified the black male perpetrator as Petaway; that Lyburtus stated that the other perpetrator was a tall, thin, white male; and, that he discovered a spent bullet across the street on the sidewalk.
 {¶ 13} Benjamin Kennedy of the Bellefontaine Fire Department testified that he is a firefighter/paramedic; that, on January 10, 2008, he treated Lyburtus in the back of an ambulance for a head injury and a hand injury; that Lyburtus had an abrasion on her head that was bleeding and swollen and an abrasion on her hand; that Lyburtus refused to go to the hospital; and, that Lyburtus stated she was injured when she was struck with a gun.
 {¶ 14} Officer Craig Comstock of the Bellefontaine Police Department testified that he participated in the investigation of the incident; that he received a report that the suspects were running westbound so he began to patrol the area; that he saw a tall, white male running westbound throw an object onto the ground in a parking lot; that the man was running toward a bar called "Sandy's Outlaws"; and, that he discovered a black nine-millimeter magazine and one nine-millimeter round laying on the ground where the man had thrown the object.
 {¶ 15} Detective Scott Sebring of the Bellefontaine Police Department testified that he processed the crime scene; that he discovered one spent bullet and three empty shell casings; that the empty shell casings were located on the sidewalk, the steps of the porch, and across the street; that, at Sandy's Outlaw's, *Page 9 
he discovered the tall, white man, Jason Mahe, and a knife hidden inside a pool table at the bar; that he eventually learned that Petaway, Colby Harris, and Matt Haley were also involved in the crime; that he arrested Harris and Haley on January 12, and both admitted that they were at 313 South Park Street during the time of the shooting, but claimed that they never entered the residence; that Haley told him that, after the incident, he and Petaway buried the nine-millimeter firearm; that Haley directed them to where they could find the firearm, which they located; that they did not request the crime lab to process latent prints on the firearm because the powder used to lift latent prints can interfere with marks on the casings, because DNA testing on the firearm cannot be done without DNA from a suspect, which they did not have at the time, and because they knew that Haley had also touched the firearm, which could interfere with DNA testing; and, that they did not apprehend Petaway the night of the incident, but approximately ten days later.
 {¶ 16} Detective Dwight Salyer testified that he discovered Petaway had purchased a bus ticket to Indianapolis under an alias on January 12, 2008, where he was eventually apprehended.
 {¶ 17} James Smith, a forensic scientist at the Bureau of Criminal Identification and Investigation, testified that he performed analysis of evidence from the incident; that he examined the nine-millimeter firearm; and, that, in his *Page 10 
expert opinion, the three empty shell casings or cartridge cases discovered at the scene were fired from the recovered firearm.
 {¶ 18} Colby Harris testified that, on January 10, 2008, he was at a bar with Mahe, Haley, and Petaway, and they discussed robbing Brown; that Mahe is a tall, white man; that the men went to Brown's home where he and Haley stood by the side of the house, and Mahe and Petaway walked up to the door; that he heard screaming inside the house and saw Brown run outside; that he saw a flash from a gun and he and Haley ran away; that he heard five or six shots fired; and, that he did not know who fired the gun, but it was either Petaway or Mahe.
 {¶ 19} Matthew Haley testified that, on January 10, 2008, he was at a bar with Petaway, Harris, and Mahe; that the men decided to rob Brown; that the men retrieved his nine-millimeter firearm; that Petaway took the firearm and carried it all the way from his house to Brown's house; that Mahe had a knife with him and carried an extra magazine for the firearm; that he and Harris stayed on the side of the house in the alley, and Petaway and Mahe went up to the house and "rushed" in; that he heard yelling and saw Brown run outside; that Petaway ran behind Brown, shooting at him; and, that he retrieved the firearm and buried it the next morning.
 {¶ 20} Jason Mahe testified that he was involved in the incident; that he had a knife and a firearm during the incident; that the men went to Brown's house to *Page 11 
rob him; that he and Petaway went up to the door; that Mahe, Petaway, Haley, and Harris all rushed into the house; that he held Brown in the corner with a knife; that Petaway was holding and pointing a firearm inside the home; that he did not realize children were in the house until he heard them screaming; that he demanded money from Brown; that he stole "money and dope" from Brown's sock; that Brown told him the rest of the drugs were in his vehicle and ran outside; that he and Petaway chased Brown and Petaway fired about four shots at Brown; and, that he went to Sandy's Outlaws and threw an extra clip for the nine-millimeter firearm under a car.
 {¶ 21} Kyna Brown, Lyburtus' cousin, testified that she had previously dated Petaway; that she saw Petaway the evening of the incident; and, that he was breathless and told her that he hoped he had not hurt Brown.
 {¶ 22} Additionally, the parties stipulated that Petaway had been convicted of drug possession in 2004, which prohibited him from possessing a firearm under R.C. 2923.13(A)(3).
 {¶ 23} Thereafter the jury returned a verdict finding Petaway guilty of aggravated burglary with a firearm specification; aggravated robbery with a firearm specification; felonious assault with a firearm specification; abduction with a firearm specification; and one count of having a weapon while under disability. *Page 12 
 {¶ 24} In September 2008, the trial court sentenced Petaway to an eight-year prison term on the aggravated burglary conviction with a mandatory three-year prison term on the firearm specification; to a seven-year prison term on the aggravated robbery conviction with the firearm specification merging; to a six-year prison term on the felonious assault conviction with the firearm specification merging; and, to a one-year prison term on the weapons under disability conviction. Additionally, the trial court merged the abduction conviction with the aggravated robbery conviction. Finally, the trial court ordered that all sentences be served consecutively to each other and to the three-year firearm specification, for an aggregate twenty-five year prison term.
 {¶ 25} It is from his convictions and sentence that Petaway appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT IN ALLOWING THE TESTIMONY OF CHILDREN 10 YEARS AND UNDER AT THE TRIAL WHERE THEIR COMPETENCY IS SUSPECT IN THAT THE CHILDREN DID NOT APPEAR CAPABLE OF RECEIVING JUST IMPRESSIONS OF THE FACTS AND TRANSACTIONS RESPECTING WHICH THEY ARE EXAMINED, OR OF RELATING THEM TRULY IN VIOLATION OF RULE 601 AND 403 OF THE OHIO RULES OF EVIDENCE, THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION. *Page 13 
 Assignment of Error No. II THE DEFENDANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 Assignment of Error No. I {¶ 26} In his first assignment of error, Petaway argues that the trial court erred in allowing the three children to testify because their competency was suspect. Specifically, Petaway argues that the children did not appear capable of receiving just impressions of the facts or of relating them truthfully. Additionally, Petaway claims that the testimony of the children was cumulative and served only to inflame the jury. We disagree.
 {¶ 27} Pursuant to Evid. R. 601(A), every person is competent to be a witness except children who are under the age of ten and "appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." The trial judge has a duty to conduct a voir dire examination of a child who is under ten years of age in order to determine if the child is competent to testify. State v. Frazier (1991), 61 Ohio St.3d 247,250-51. The determination of a child's competency lies within the trial judge's sound discretion, as he or she has the opportunity to "observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully." Id. As the determination of whether a child is competent to testify rests within the sound discretion of the trial *Page 14 
court, we will not reverse that determination absent an abuse of discretion. State v. Brock, 3d Dist. No. 5-07-42, 2008-Ohio-3220,¶ 51, citing State v. Clark, 71 Ohio St.3d 466, 469, 1994-Ohio-43.
 {¶ 28} In making a determination of a child's competency, the Supreme Court of Ohio has directed trial courts to consider "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity, and (5) the child's appreciation of his or her responsibility to be truthful." Brock, 2008-Ohio-3220, at ¶ 51, quoting Frazier,61 Ohio St.3d at 251. Additionally, the Supreme Court of Ohio has held that "[u]nder the plain meaning of Evid. R. 601(A), a child witness who is ten years of age or older at the time of trial, but who was under the age of ten at the time an incident in question occurred, is presumed competent to testify about the event." Clark, 1994-Ohio-43, at paragraph one of the syllabus.
 {¶ 29} Initially, we note that both Skylar and Aurelio were eleven years old at the time of trial. Thus, under Frazier and Evid. R. 601(A), both children were presumed competent to testify about the events. Additionally, even had Skylar and Aurelio been under ten years of age at the time of trial, we would still find that the trial court did not abuse its discretion in finding them competent to testify. *Page 15 
Skylar was able to articulate that a lie is when someone does not tell the truth; that he would be punished if he did not tell the truth; that he would tell the truth because he did not want to get in trouble; and, that lying is bad. Additionally, when posed the question "if I asked you to promise me to do something, will you do it," Skylar stated that "matters what it is[.] * * * If it was like stealing or something, I wouldn't do it," but that, if asked to promise to tell the truth, he would do it.
 {¶ 30} Concerning Aurelio, Petaway specifically points to the fact that Aurelio's ability to receive accurate impressions of fact was not addressed in the voir dire examination; that Aurelio stated that he did not know how to explain what a promise meant; and, that Aurelio responded "no" when asked "if not telling the truth makes him not trustworthy." When asked "do you think that makes you trustworthy when there's some of the time that you don't tell the truth," Aurelio responded "no." It is well-established that questioning of children should be simple and not confusing. State v. Alvarado, 3d Dist. No. 12-07-14, 2008-Ohio-4411. Here, the question posed to Aurelio was confusing, and his answer should hardly be determinative of his competency. In fact, the record demonstrates that Aurelio stated that "to tell the truth" meant being honest; that it is a bad thing to lie and people usually get in trouble for lying; and, that it is important to tell the truth. *Page 16 
Further, Aurelio corrected Petaway's counsel's misstatement that he was much older than Skylar, stating that "No, I'm only one day older." (Trial Tr., p. 199).
 {¶ 31} As Desmond was nine years of age at the time of trial, the trial court had a duty to conduct a voir dire examination concerning his competency to testify. Petaway argues that the trial court should not have found Desmond competent to testify and points to the fact that Desmond's ability to receive accurate impressions of fact and to recollect those impressions was not addressed in the voir dire examination; and, that Desmond stated that he would not tell the truth if it would get someone in trouble. However, Desmond was able to state that when someone lied they would get into trouble, but that when someone told the truth they would probably not get into trouble, and that he would be willing to tell the truth under any circumstances. Desmond also related details regarding his and his cousins' birthday parties; recalled that he was in court because of a robbery; and, corrected the trial court's erroneous statement that he and Skylar were brothers. In light of these statements, we find that the trial court considered the appropriate factors under Frazier and did not abuse its discretion in finding that Desmond was competent to testify.
 {¶ 32} Next, Petaway contends that the testimony of the children was cumulative and served only to inflame the jury. *Page 17 
 {¶ 33} "`The decision of whether or not to admit evidence rests in the sound discretion of the [trial] court[.]'" State v. Maag, 3d Dist. No. 5-01-49, 2002-Ohio-3953, ¶ 20, quoting Wightman v. Consolidated RailCorp. (1999), 86 Ohio St.3d 431, 437. As such, this Court will not reverse the trial court's decision unless it was unreasonable, arbitrary, or capricious. Id.
 {¶ 34} Evid. R. 403 provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury" and that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."[1]
 {¶ 35} Here, each child's testimony was probative because it presented his own viewpoint and account of the incident, and one of the children was able to identify Petaway as the perpetrator. As such, we find that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice or by considerations of needless presentation of cumulative evidence.
 {¶ 36} Accordingly, we overrule Petaway's first assignment of error. *Page 18 
 Assignment of Error No. II {¶ 37} In his second assignment of error, Petaway argues that his convictions were against the manifest weight of the evidence. Specifically, Petaway contends that there was testimony that the firearm was not tested for fingerprints or trace DNA; that several witnesses testified that only Mahe and Petaway went into the house, while Mahe testified that all four men went into the house; that empty casings were discovered in the front yard of the home, even though there was testimony that the firearm was fired just inside the door of the home; and, that the crime scene and physical evidence collection were not handled properly. We disagree.
 {¶ 38} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins,78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id. *Page 19 
 {¶ 39} Here, Petaway complains that the firearm was not tested for fingerprints or trace DNA and that none of the four Defendants' persons or clothing were tested for gunshot residue during the course of the investigation. However, testimony was heard that investigators did not request the crime lab to process latent prints on the firearm because the powder used to lift latent prints can interfere with marks on the casings, and that DNA testing was not attempted because it cannot be done without DNA from a suspect, which they did not have at the time, and because they knew that Haley had also touched the firearm, which could interfere with DNA testing. Additionally, testimony was heard that Harris and Haley were not discovered until two days after the incident, and Petaway until ten days after the incident — thus, we can assume that testing these suspects or their clothing for gunshot residue would be futile. Further, no witnesses indicated that any of the suspects except Petaway fired the gun.
 {¶ 40} Next, Petaway contends that the State's witnesses contradicted each other, as several testified that only Petaway and Mahe entered the home, but Mahe testified that all four perpetrators entered the home. However, the issues of whether Harris and Haley entered the home are largely irrelevant to whether Petaway committed the offenses, as it was not contradicted that Petaway entered the home. While these facts may reflect on the credibility of the witnesses, we cannot find that the jury clearly lost its way, particularly given that the jury is in *Page 20 
the best position to weigh witness credibility. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77. See, also, State v. Keeton, 3d Dist. No. 14-07-48, 200 8-Ohio-2613, ¶ 32.
 {¶ 41} Next, Petaway asserts that his convictions are against the manifest weight of the evidence because spent casings were discovered in the front yard of the home, even though there was testimony that the firearm was fired just inside the door of the home. Although the testimony of the witnesses varied slightly as to where Petaway fired the shots, all five victims and two of the perpetrators testified that Petaway fired the shots at Brown as he ran away from the house. Whether the shots were fired from just inside the door of the home or in the front yard is largely irrelevant, as it was not contradicted that Petaway fired shots at Brown as he ran. As discussed above, these facts may reflect on the credibility of the witnesses, but this is the province of the finder of fact. Seasons Coal, supra.
 {¶ 42} Further, testimony existed that Petaway pushed his way into a residence; ordered the occupants of the residence to get on the floor while brandishing a firearm; demanded money while brandishing the firearm; pressed the firearm against an eight year-old child's face; struck a woman in the head and hand with the firearm; chased a man out of the residence and fired four or five gunshots at him; told his former girlfriend that he hoped he had not hurt the man; fled to Indianapolis under an assumed name; and, was not permitted to possess a *Page 21 
weapon due to a prior drug conviction. In light of this testimony, we cannot find that Petaway's convictions were against the manifest weight of the evidence.
 {¶ 43} Finally, although Petaway baldly asserts that the crime scene and physical evidence collection was not handled properly, he has cited no specific examples supporting this assertion, and none are apparent from the record.
 {¶ 44} Accordingly, we overrule Petaway's second assignment of error.
 {¶ 45} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed
 PRESTON, P.J. and SHAW, J., concur.
[1] We note that the State's brief avers that "[a] trial court has no authority to unreasonably restrict the right of a party to offer additional testimony, even though the same may be cumulative." However, Evid. R. 403(B) clearly provides that a trial court may exclude relevant evidence where it is needlessly cumulative. *Page 1