[Cite as *State v. Branch*, 2013-Ohio-3192.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  1-12-44

    v.

CLEVELAND BRANCH, JR.,           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2011 0456

Judgment Affirmed

Date of Decision:   July 22, 2013

APPEARANCES:

    *Michael J. Short*  for Appellant

    *Jana E. Emerick*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Cleveland Branch, appeals the judgment of the Court of Common Pleas of Allen County convicting him on three counts of rape and five counts of gross sexual imposition and sentencing him to a prison term of 70 years to life. On appeal, Branch argues that the trial court committed the following errors: (1) failing to suppress his statements that were allegedly obtained in violation of the Fifth Amendment to the United States Constitution; (2) finding that the child victim was competent to testify at trial; (3) failing to grant him access to purportedly relevant child services files; (4) allowing another person to sit with the child victim during her testimony; (5) entering verdicts that were not supported by sufficient evidence; and (6) entering verdicts that were against the manifest weight of the evidence. Branch also claims that he was denied the effective assistance of counsel. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On December 15, 2011, the Allen County Grand Jury indicted Branch on three counts of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, and five counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. All three counts of rape included a specification that the victim was less than 10 years old at the time of the offenses. The indictment arose from Branch's alleged sexual abuse of S.B., his biological

daughter, in 2010 and 2011. S.B. was between six and seven years old during this time period.

{¶3} This matter has four relevant stages: (1) the pre-trial proceedings relating to Branch's motion to suppress; (2) the pre-trial proceedings relating to the determination that S.B. was competent to testify at trial; (3) the pre-trial proceedings relating to the disclosure of files held by the Allen County Children Services Board; and (4) the trial. We discuss each of these stages separately below.

*Branch's Motion to Suppress*

{¶4} On January 5, 2012, Branch filed a motion to suppress his statements made during two police interrogations that occurred on November 11, 2011. He argued that the statements were taken in violation of his *Miranda* rights. The trial court conducted a suppression hearing on January 26, 2012. At the hearing, the following relevant evidence was adduced.

{¶5} Lima Police Department Detective Steven Stechschulte first testified regarding his role in interviewing Branch. He said that the department received a report on November 10, 2011 that Branch was alleged to have sexually abused S.B. As a result of the report, Detective Stechschulte was responsible for tracking Branch and bringing him into the department for an interview. Detective Stechschulte called Branch's cell phone and asked that he immediately turn

himself into the police. However, Branch declined by saying that he wanted to obtain counsel before turning himself into the police. On November 11, 2011, Detective Stechschulte found Branch at his mother's house, arrested him, and transported him to the police department's headquarters. Branch's first interrogation session subsequently started in the early afternoon.

{¶6} Detective Stechschulte was not primarily responsible for interviewing Branch. Rather, he watched the interrogations from the "video monitor room" and he occasionally entered the interrogation room. Jan. 26, 2012 Tr., p. 10. Detective Stechschulte indicated that the first interrogation ended after four hours because "it was getting monotonous" and the officers "needed a break." *Id.* at p. 11. He denied that the interrogation session ended because Branch invoked his right to counsel. After the session ended, another detective led Branch to a holding cell. But, on the way to the cell, "Branch indicated to [the detective] that he wanted to have further conversations to explain himself." *Id.* There was a three to five minute break between Branch's removal from the interrogation room and his return. Once Branch returned, the second interrogation session commenced. It lasted for an additional two hours. Detective Stechschulte said that the police ordered and provided Branch with food and water during the course of the sessions.

{¶7} On cross-examination, Detective Stechschulte testified that the officers did not issue a *Miranda* warning before the second interrogation session. He explained that "[s]ince the break in the conversation was a matter of minutes * * * we considered [the second session] a continuation of the first interview." *Id*. at p. 15.

{¶8} Lima Police Department Investigator Robert Stoodt then took the stand. He indicated that he administered Branch's *Miranda* rights at the beginning of the first interrogation session. Investigator Stoodt testified that he used a written waiver form, which Branch signed after the *Miranda* admonishment. The form included the following language:

**ADMONISHMENT FORM**

IT IS MY DUTY TO ADVISE YOU THAT UNDER THE CONSTITUTION OF THE UNITED STATES AND THE CONSTITUTION OF THE STATE OF OHIO, YOU DO NOT HAVE TO MAKE ANY STATEMENT AND IF YOU DO MAKE A STATEMENT, WHAT YOU DO SAY MAY BE USED AGAINST YOU IN COURT. YOU ARE FURTHER ADVISED THAT IF YOU DO WISH TO MAKE A STATEMENT YOU HAVE A RIGHT TO HAVE YOUR ATTORNEY PRESENT DURING THE TAKING OF THIS STATEMENT AND THAT YOU IF YOU DO NOT HAVE THE FUNDS TO EMPLOY AN ATTORNEY, THEN AN ATTORNEY WILL BE APPOINTED, WITHOUT ANY EXPENSE TO YOU, TO REPRESENT AND ADVISE YOU.

**<u>WAIVER</u>**

I HAVE HAD MY RIGHTS SHOWN ABOVE READ TO ME. I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO

ANSWER QUESTIONS AND MAKE A STATEMENT. I DO NOT WANT AN ATTORNEY AT THIS TIME. I UNDERSTAND AND KNOW WHAT I AM DOING. NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OF ANY KIND HAS BEEN USED AGAINST ME. (State's Exhibit "3").

**{¶9}** Lima Police Department Detective Scott Leland was the final witness called by the State at the January 26, 2012 hearing. In regard to the break between interrogation sessions, he testified as follows:

Q: Did you have some additional conversation with [Branch] that was not in the interview, and therefore, [not recorded]?

A: Yes, ma'am.

Q: Okay. Can you explain to the Court just the context of that and how that interaction with [Branch] came about and then we'll go into what the conversation, if any, was?

A: Yes. The investigating officers had completed their interview with [Branch]. I think they had been at it for quite some time. I offered to take him back down to the first floor from the detective bureau so he could be transported to the county [jail]. During taking him downstairs I briefly spoke with him and he wanted to come back up and talk to the officers again.

Q: Okay. Can you tell the Court as precisely as possible what the extent of your conversation was? What was it that you said to [Branch] when you said you briefly spoke to him?

A: I just told him that he was in trouble and that as soon as they had, or the physical evidence came back, that it was going to be too late for him to offer any kind of statement or remorse and that if he was going to do it that he needed to do it now with the guys. That was the extent of the conversation. It was very short. I took him down to the holding room and as I was closing the door he said, "Hold on, I'd like to talk to them." I said, "I'll tell them." I closed

the door and I went back upstairs and I told Detective Stechschulte about our conversation. A short time after that I think Detective Stechschulte went down and got [Branch] and brought him back up. Jan. 26, 2012 Tr., p. 20-21.

On cross-examination, Detective Leland denied offering Branch any special considerations in exchange for his statement.

{¶10} At the hearing, the State offered the DVD recordings of the two interrogation sessions into evidence. Based on our independent review of the recordings, we find that the trial court properly summarized the contents of the recordings as follows:

The DVD recordings show that the first interrogation started around 1:34 p.m. Investigator Stoodt started the interrogation by obtaining some personal information from [Branch]. Afterwards, [Investigator] Stoodt admonished [Branch] of his [*Miranda*] rights * * *, using a standard admonishment form[.] * * * [Branch] asked about getting an attorney while he was in jail. He was told that he would be allowed to use the phone to call an attorney. [Branch] said he would prefer to call an attorney. [Branch] said he counseled with his pastor and did not know what was going on and did not want to incriminate himself if he did not know what was going on. [Branch] asked about the waiver portion of the admonishment form. That portion was read and explained to him. [Investigator] Stoodt said he could not talk to him unless [Branch] agreed to talk to him. [Branch] said he was trying to figure out what he was going to do. [Branch] asked if he could get an attorney after he waived his right at that time and was told he could. [Branch] was troubled that he could not go out and get the attorney he wanted because he was in custody. [Branch] knew his daughter had been medically examined. [Branch] said it was "his life" and he would do it (talk to police), but wanted to make sure he could still get an attorney later. He was assured that he could get and would have an attorney. [Branch] was advised he could stop the interrogation when and if he got tired of

being questioned. [Branch] signed the waiver portion of the admonishment form.

[Branch] was made aware of the nature of the allegations against him and what his daughter was saying he did to her. [Investigator] Stoodt said there were allegations of inappropriate touching involving his daughter. [Branch] continued to talk to the officers about the allegations and continued to deny any wrongdoing. About an hour and fifteen minutes into the first interrogation session, [Branch] again explained that he did not turn himself in earlier because he wanted to talk to a lawyer about turning his warrant into a summons. Detective Stechschulte joined in the interrogation. [Branch] never asked for a lawyer or to stop the interrogation. After about two hours and forty minutes, officers left [Branch] alone in the interview room for several minutes, but then Detective [Kent] Miller came back in and questioned [Branch] some more. [Detective] Stechschulte came back into the interrogation room and joined in the interrogation for another forty-five minutes or so after that. [Detective Stechschulte] left, but [Detective] Miller continued to talk to [Branch]. [Detective] Stechschulte returned and asked [Branch] if he would submit to a lie detector test. [Branch] said he would take a lie detector test, if he had his lawyer present and his lawyer advised him to take one. The first interrogation session lasted about four hours. At about the three hour and forty-one minute mark, [Branch] was reminded again that he could get a lawyer and that officers would stop the interrogation right then, if [Branch] wanted. [Branch] never invoked his right to stop the questioning. (Docket No. 34, p. 2-4).

{¶11} In total, the DVD recordings show Branch mentioning attorneys on three occasions. First, Branch stated that he did not turn himself in earlier because he was seeking a lawyer. In the second reference, he discussed "cop shows" and how they suggest that a person should always have a lawyer present during questioning. (State's Exhibit "1"). In the third and final reference, Branch said

that "[i]f [he] got the opportunity to get his lawyer," he would take a lie detector test. (*Id*.).

{¶12} On February 2, 2012, the trial court denied Branch's motion to suppress. It found that Branch was properly advised of his *Miranda* rights and that he validly waived them. Further, the trial court found that Branch never invoked his right to counsel during the course of the interrogation and that the interrogating officers did not need to re-Mirandize Branch before the second interrogation session.

{¶13} On May 16, 2012, after obtaining new counsel, Branch filed a "Motion for Further Hearing/Motion to Suppress Statements." (Docket No. 78, p. 1). Branch's basis for the motion was that he wished to testify on his own behalf regarding the suppression issue. In addition to arguing that the interrogations violated his *Miranda* rights, Branch contended that the police had no probable cause to arrest him. On May 22, 2012, the trial court granted Branch's motion and reopened the suppression proceedings.

{¶14} On June 11, 2012 and June 27, 2012, the trial court conducted additional hearings on Branch's suppression motion. Detective Stechschulte again testified on behalf of the State. He indicated that Branch was taken into custody on the basis of probable cause. Detective Stechschulte said that the arresting officers had probable cause to arrest Branch simply due to S.B.'s statements.

{¶15} Branch then testified. He said that before his arrest, Detective Stechschulte called him to ask that he give himself up to the police. Branch said he informed Detective Stechschulte that he would do so in a couple of days after he had the chance to consult with and retain an attorney.

{¶16} After his arrest, Branch said he was first taken to a holding cell, where Detective Miller talked with him. This conversation, according to Branch, lasted "a good twenty, twenty-five minutes." June 11, 2012 Tr., p. 22. In regard to this conversation, he testified as follows:

> Q: Was there any conversation while you were with Detective Miller about uh, getting an attorney or wanting an attorney?
>
> A: I was asking him questions uh, in that case, I was telling him, I was like, I wanted to get my attorney because I didn't want [to] say anything that's gonna incriminate me.
>
> Q: Okay. And what was his response to that?
>
> A: We'll have to go upstairs and talk to the other detectives and stuff * * *. *Id*. at p. 22-23.

{¶17} According to Branch, the DVD recordings do not include a conversation in the interrogation room between him and the interrogating officers regarding his retainer of an attorney. This purportedly occurred before the DVD recording of the first interrogation session started. Branch testified that in this conversation he again told the interrogating officers that he wanted to get his attorney before making an incriminating statement. It was after this conversation

-10-

that the interrogating officers read Branch his rights. He indicated that the only reason he signed the *Miranda* waiver was because of Investigator Stoodt's representation that the police could not discuss the allegations against him until he did so. As a result, Branch testified he signed the waiver form "[b]ecause [he] wanted to know why [he] was there and what was said against [him]." *Id*. at p. 26.

{¶18} As to the break between interrogation sessions, Branch testified as follows:

> A:   On the way down to [the holding cell, Detective Leland] was just telling me how much trouble I was in and all this uh, evidence they took from the house that's leading straight to me. An uh, he was telling me that the judge is not gonna want to hear anything that I have to say because of the little girl, you know, if she gets on the stand and they [were] telling me that it's a no-win situation. So it was just – pounding on me over there with those – and I didn't know what else to do. *Id*. at p. 27.

Branch further described this interaction with Detective Leland as follows:

> A:   [Detective Leland told me] that I'm going down for a long time because I heard what [Detective] Miller said that they have some things from the house that could uh, get me uh, I mean, get me locked up for a long time. And we had like uh, I couldn't remember every word for word what he was saying, but it was just like, the judge is not gonna hear anything you have to say. You might as well fess up and be a man, and accept this, and uh, he actually told me that he's gonna go out the room and that if I decide that I wanted to continue [to] talk to him again, he said – they said they gonna talk to me again, and he said if I decide to, you know, before that time, to just knock on the door and he'll come and get me. *Id*. at p. 28.

Branch also contradicted Detective Leland's testimony at the previous suppression hearing and testified that the break between interrogation sessions was

approximately 45 minutes. Branch said that he asked Detective Leland to bring him back to the interrogation room after telling him, "[W]hatever man, I mean, I'll tell you all what you all want to hear." *Id*. at p. 33. When he returned to the interrogation room, he was not re-Mirandized. In regard to his right to counsel, Branch testified that "[m]y impression was, those guys wouldn't try to give me a shot, like, to even get [a lawyer]." *Id*. at p. 33-34.

{¶19} In the second interrogation session, Branch made several incriminating statements, which he testified were false. He said that he gave the false statement because:

> I felt like I didn't have nothing left. I mean, if I'm gonna go down regardless cause I said many a times I told them, I said, "So you mean to tell me this is a no win situation?" And they were like, yep, pretty much. So I just felt like there wasn't nothing left. I mean, it's not the first time that me and my wife had a situation, not like this though, but that I had lost everything, you know, and I took the rap for certain things to save her and everything, from Children Services and all that. *Id*. at p. 34-35.

Branch also testified that he felt that giving a confession would be beneficial to him in that it would lead to a lesser sentence.

{¶20} The hearing was continued to June 27, 2012 so that the State could call rebuttal witnesses. Investigator Stoodt testified again. He denied having any communications with Branch before the DVD recording of the first interrogation started.

{¶21} Detective Kent Miller, with the Lima Police Department, then testified. He said that he first made contact with Branch in his holding cell during the booking process. According to Detective Miller, he went to Branch so that he could collect a DNA swab. Detective Miller described this initial contact as follows:

> A: I stepped in and – I had some prior knowledge of [Branch] as far as, well, I worked security years ago for an adult ed. program. I would say it was upwards of maybe fifteen years ago that I knew, or, met him as a student there. He, and the mother of the victim, and his sister were all students at the same time. I struck up a conversation inquiring if he remembered me from speaking with them down there when he attended school there. He did. We talked a little bit about his sister, how she was doing, and then I explained to him why I was going to take him upstairs to have this DNA swab collected. From there he began asking questions about what was being alleged and I told him, you know, that I couldn't answer the questions or get into the specifics without actually going over his rights – that was one aspect – as well as I didn't actually know all of the particulars because I.D. Officer, or, Investigator Stoodt was the one that took part in the interview of the victim. I said that I could make that investigator available, too. June 27, 2012 Tr., p. 6-7.

Detective Miller said that Branch initiated the discussion regarding the particulars of the allegations against him. Detective Miller also denied that Branch requested an attorney during this initial contact or that he indicated he was going to remain silent. According to Detective Miller, this initial contact lasted approximately 10 to 15 minutes.

{¶22} Detective Miller said that he personally escorted Branch to the interrogation room. He said that besides the initial contact and the DNA swab

collection, the remainder of his interaction with Branch was on the DVD recordings. Detective Miller also testified that once they were in the interrogation room, Branch never requested an attorney or invoked his desire to remain silent before the recorded interrogation began.

{¶23} On cross-examination, Detective Miller confirmed that he told Branch they could not discuss the case until he was Mirandized, but acknowledged that that statement was not true:

> Q: But, my question to you, Detective Miller – is that true, is that correct that you cannot answer a person's questions, in your opinion, until they've been Mirandized?
>
> A: No. I could have answered them if I had chose [sic] to.
>
> Q: If you chose to; correct?
>
> A: If I chose to. *Id*. at p. 19.

Nevertheless, Detective Miller said that he and the other officers did not purposefully make this representation to coerce Branch into signing the *Miranda* waiver form. Rather, he said that the representation was made because "this was a case of a nature that we could not give him specifics for fear he would – I didn't want it to become a situation where he's spoon fed details and then either agrees with things or – it is something that would have to be more forthright from him * * *." *Id*. at p. 20.

{¶24} On July 10, 2012, the trial court again denied Branch's motion to suppress. It found that S.B.'s statement was a sufficient basis for probable cause to arrest Branch. Meanwhile, in ruling that Branch did not invoke his right to counsel during the interrogation, the trial court found that Branch's testimony informing Detective Miller about his desire for an attorney was not credible. The trial court also found that the police were not required to re-administer the *Miranda* admonition before the second interrogation session. In reaching this conclusion, the trial court found that a "very short time elapsed between the first and second interrogation session." (Docket No. 99, p. 14).

*S.B.'s Competency*

{¶25} On May 17, 2012, the State filed a motion to determine S.B.'s competency to testify at trial. The trial court held a hearing on August 15, 2012 in which it conducted an interview of S.B. At that time, S.B. was seven years old and about to enter the second grade. She indicated that she knew her address, her school, her church, how to read and write, and the names of both her current and past school teachers. While S.B. indicated that she did not remember much about the previous Christmas, she did say that she remembered getting a dress and magic wand as presents.

{¶26} In regard to the difference between lies and truthful statements, S.B. responded as follows:

> The Court: Okay. Alright. Now, have you ever in school, or at church talked about what it means to tell the truth, or tell a fib, or to tell a lie?
>
> S.B.: Yeah.
>
> The Court: What do you think it means to tell the truth?
>
> S.B.: It means – it means that if you lie you'll get in so many – in so much trouble. So, I used to lie when I was little.
>
> * * *
>
> The Court: Okay. What do you think it means to tell a lie?
>
> S.B.: It means – I don't know. I don't remember.
>
> The Court: Is that the same thing as telling the truth – to tell a lie?
>
> S.B.: Uh huh. Aug. 15, 2012 Tr., p. 8-9.

At this point, the trial court probed further into S.B.'s ability to distinguish lies from truthful statements. In doing so, the judge asked whether it was lie to say that he had purple hair. S.B. properly responded that such a statement would be a lie.

{¶27} As to S.B.'s ability to testify truthfully at trial, S.B. said that she went to court for the hearing "[t]o tell the truth." *Id*. at p. 10. She further stated that "it's better to tell the truth." *Id*. at p. 12. S.B. also said as follows:

> The Court: * * * If you come back into this court anytime would you be sure to tell the truth and not lie about anything?
>
> S.B.: I won't lie.

-16-

The Court:   Okay.  And you can make that a promise.  You know what a promise is?

S.B.:   Uh huh.

The Court:   And you could promise to tell the truth if we ask you any questions?

S.B.:   Uh huh.  I'd pinky promise. *Id.* at p. 13.

{¶28} The trial court allowed the attorneys for both the State and Branch to ask further questions.   In response to these questions, S.B. indicated she remembered the address at her old house.  She properly said it was truthful to say that the judge's robe was black.  S.B. also said that she would not tell a lie in court even if someone asked her to because doing so would get her in more trouble.

{¶29} On August 16, 2012, the trial court issued an order finding that S.B. was competent to testify at trial.  Specifically, the trial court found that S.B. was "capable of receiving just impressions of the facts and transactions and of relating them truly."  (Docket No. 131, p. 2).

*Disclosure of Allen County Child Services Board's Files*

{¶30} On September 27, 2012, Branch filed a motion for the in camera inspection of records.  The motion specifically requested that the Allen County Children Services Board turn over its records relating to Branch, his wife, Leah Wilbert ("Leah"), and their children.  It further requested that the trial court review

the records to determine whether they could be used as evidence at trial. On that same day, the trial court granted Branch's motion.

{¶31} Branch's trial counsel proffered that the child services records would possibly contain evidence that Leah physically abused the children, including S.B., which left them intimidated and afraid for her. Counsel also proffered that the records would show that "[Leah] has a pattern of making false allegations" against Branch. Trial Tr., p. 138. According to counsel, this evidence was necessary to establish the defense's theory of the case that the allegations against Branch were concocted by Leah.

{¶32} The trial court conducted the requested review and issued an order on October 1, 2012. After its review, the trial court found that an Activity Log Report from November 10, 2011 was relevant because it included reports relating to S.B.'s abuse allegations. As a result, the trial court ordered that these relevant records be released to Branch. However, it found that "the remaining contents of the records and reports (that have not already been disclosed) do not contain any exculpatory evidence or inconsistencies." (Docket No. 197, p. 4). Consequently, it ordered that the irrelevant and extraneous materials not be released to Branch.

*Trial Proceedings*

{¶33} The trial of this matter commenced on October 2, 2012 and ended on October 5, 2012. The State's first witness was Gail Garcia, a volunteer at

Cornerstone Harvest Church, which S.B. attended along with her family. On direct examination, Garcia testified generally that Leah looked upset before evening church services on Wednesday, November 9, 2011. As a result, Gail arranged for Leah to talk to a pastor. On cross-examination, Branch elicited the following testimony:

> Q: Okay. So, it's your impression then, after having talked to Leah, that [S.B.] had told her this troubling information. Did Leah tell you what it was that [S.B.] told her?
>
> A: She didn't go into graphic details but, yes, she told me what [S.B.] told her.
>
> Q: Why don't you tell us? What was it?
>
> A: She said that it was forced oral sex and rape vaginally.
>
> Q: Okay. Vaginally?
>
> A: Uh-huh. At that point that's all she knew.
>
> Q: Okay. That's what Leah told you?
>
> A: Yes.
>
> Q: That's what [S.B.] told her?
>
> A: Yes. Trial Tr., p. 55-56.[1]

---

[1] Branch's trial counsel asked this question even after the witness admonished him that the evidence was merely hearsay:

> Q: Do you know when [S.B.], the young daughter, had made these comments to her mother?
> A: Again, it's only hearsay.
> Q: That's okay. Trial Tr., p. 54.

{¶34} The State's second witness was Assistant Pastor Terri Vonderau of the Harvest Cornerstone Church. As part of her pastoral duties, Pastor Vonderau met with Leah and S.B. on November 9, 2011 to discuss S.B.'s revelations of sexual abuse. Pastor Vonderau asked S.B. what happened and "[S.B.] got very frightened. She started shaking badly." *Id*. at p. 60. The pastor testified that she calmed S.B. and asked where Branch touched her. According to Pastor Vonderau, S.B. responded by "motion[ing] between her legs and then to her back side, to her rear end." *Id*. Around the time of these statements, S.B. was "crying very loudly" and "screaming." *Id*. at p. 62.

{¶35} The State's third witness was S.B. Before she was called to the stand, the State moved to allow Pastor Vonderau to sit next to S.B. while she was testifying. The trial court granted the State's motion, over Branch's objection, and allowed Pastor Vonderau to sit in a chair next to S.B. during her testimony. The trial court noted that "Pastor Vonderau did nothing, absolutely nothing, during [S.B.]'s testimony other than sit there and occasionally, well, once or twice move the microphone a little closer to the witness's mouth when her voice was trailing off and she couldn't be heard." *Id*. at p. 124.

{¶36} S.B. first discussed her revelations to Leah on November 9, 2011. Specifically, S.B. testified as follows: "I told [Leah] that my dad – my dad did some – my did a pretty nasty thing and he hurt me and I didn't like it so I just

-20-

blursted [sic] out and * * * I just * * * shouted out to my mom." *Id.* at p. 82. S.B. said she was moved to come forward at that time "[b]ecause God told [her] to" and because Branch told her that they were going to engage in sexual activity later that evening. *Id.* at p. 83.

{¶37} As to the type of sexual activity that purportedly occurred between S.B. and Branch, S.B. testified as follows:

> Q: Okay. What sort of nasty things would daddy do? I want you to be as specific as you can for me; okay? You take your time.
>
> A: I would touch his – I would his wiener and he would put his wiener in my mouth and in my butt.[2] *Id.* at p. 84.

S.B. identified a "wiener" as a "boy private part" and as a "penis." *Id.* S.B. also indicated that "white stuff" came out of Branch's penis when they allegedly engaged in the sexual activity. *Id.* at p. 86.

{¶38} On cross-examination, Branch's defense counsel elicited testimony to gauge whether S.B. was coached before her testimony. A relevant exchange proceeded as follows:

> Q: About the white stuff coming out and how the wiener gets hard and stuff? Did your mommy tell you about that stuff?
>
> A: No, she didn't tell me about it. I asked her, but she said wait until I get older. So, I'm going to wait until I get older. But, I saw the white stuff. *Id.* at p. 95.

---

[2] We have reviewed the entirety of S.B.'s testimony and the extensive details regarding the sexual activity that occurred between Branch and S.B. Due to their graphic nature, and the depravity of the acts alleged, we find it unnecessary to reproduce these details in full here.

The following colloquy also occurred:

> Q: Okay. But as far as [Branch] actually having you put [his penis] in your rear end, or in your mouth, that type of thing, that didn't really happen; did it?
>
> A: It did really happen.
>
> * * *
>
> Q: Is it possible that you just think that happened and it really didn't happen, [S.B.], with your daddy?
>
> A: It did really happen.
>
> Q: It did really happen?
>
> A: Uh-huh. *Id*. at p. 99-100.

Whenever pressed by Branch's attorney, S.B. responded that she was telling the truth and that her allegations were not made up or false.

{¶39} On redirect examination, S.B. said that Branch touched her vagina, but did not insert his penis or finger into it. S.B. again denied that anybody told her how to testify. Rather, she testified that her mother told her "to tell the truth" and to remember the scripture verse "God has not gave [sic] me spirit of fear, but the power of a sound mind."[3] *Id*. at p. 116.

{¶40} Before proceeding to other witnesses, the State made a motion regarding the actions of Branch's trial counsel, which the State described as an "on-going and blatant disregard to the boundaries set by law for his conduct." *Id*.

---

[3] This verse fully reads as follows: "For God hath not given us the spirit of fear; but of power, and of love, and of a sound mind." *2 Timothy* 1:7 (King James).

at p. 125. The motion specifically pointed out trial counsel's reference during voir dire and opening arguments to Branch's potential punishment, the racial composition of the jury, and his personal vouching for witnesses. The trial court ruled that the motion was "well taken in several regards." *Id*. at p. 133.

{¶41} Leah was the next witness called to the stand. She indicated that she was formerly married to Branch but that they had obtained a divorce during the pendency of this matter. She testified that when she was married to Branch, she, Branch, her child from a previous relationship, and the couple's two children lived together in a house on Union Street in Lima. According to Leah, there were times when Branch was at the house alone with S.B. since Leah and Branch had different work schedules.

{¶42} Leah recounted S.B.'s disclosure of her father's alleged sexual abuse on November 9, 2011. She said that upon the family's arrival at their church, S.B. went to her. Leah testified that S.B. had "big eyes" and a "shaky voice," which alerted her that "something was wrong." *Id*. at p. 165. At that point, Leah said that S.B. told her "she didn't want to touch daddy's wiener anymore." *Id*. Leah also testified to the aftermath of S.B.'s disclosure, including her taking of S.B. to the police station for a statement and the family's relocation from the house on Union Street.

{¶43} Leah denied that there was an incident where S.B. saw or touched a classmate's penis at school. She also denied hearing of such an incident from Branch. Leah said that she never performed oral sex on Branch in front of S.B. Further, Leah indicated that while Branch had multiple sclerosis, his condition had not previously caused him to black out or suffer from amnesia.

{¶44} Leah finally testified as to Branch's behavior around the time of S.B.'s disclosure. This testimony proceeded as follows:

> Q: Now, looking back, is there anything that your husband said or did in the weeks prior to [the disclosure] that now seems unusual or an indication that there may have been a problem?
>
> A: All I know is that one time he had asked me, he said, "What would make you divorce me?" He asked me quite a few times. One time he told me, he said that he done [sic] something he don't [sic] think that God can even forgive him. One time he had set [sic] down and he talked to me and he said that he had committed adultery. *Id.* at p. 177.

{¶45} On cross-examination, Leah acknowledged that there was "quite a bit of turmoil in [her] marriage." *Id.* at p. 190. As a result, Leah left Branch "[n]umerous times" with the children. *Id.* at p. 192. She admitted that S.B. never told her about the allegations during these previous times that the children were out of the house.

{¶46} Lisa Wilt, a registered nurse at Lima Memorial Hospital, then testified. She is a "SANE nurse," which she described as "a sexual assault nurse examiner, which means you take care of patients that have been victims of sexual

-24-

assault." *Id.* at p. 205. Wilt examined S.B. on November 10, 2011 and testified that during the examination, S.B. discussed Branch's sexual activity with her.[4] Wilt also discussed the conduct of Leah and S.B. during the examination:

> Q: Okay. Was there anything about [S.B.] and [Leah]'s interaction with one another that caused you concern that perhaps her mother was pressuring her to make allegations that were untrue?
>
> A: No, ma'am.
>
> * * *
>
> Q: Okay. Is that something that you're looking for as a healthcare provider that you're vigilant about is the interaction between the two?
>
> A: Yes, ma'am. *Id.* at p. 225.

Finally, Wilt said that after her examination of S.B., she scheduled a follow-up appointment at the Kids' Clinic, which is part of the Lima Memorial Hospital.

{¶47} Gayle Cheney, another registered SANE nurse at Lima Memorial Hospital, was the next witness to testify. She examined S.B. during her follow-up appointment on November 15, 2011. According to Cheney, when S.B. first discussed the reason for her appointment, she was "a little withdrawn" and indicted that she did not want to talk about it. *Id.* at p. 235. Cheney testified that S.B. told her "[m]y dad hurts me lots of times" and that "he hurt my breast and my

---

[4] Wilt testified that it was medically pertinent to ask who the alleged sexual perpetrator was because "if you have a five year old that's touching your bottom the chances they have a [sexually transmitted disease is lower] * * * as opposed to someone that's twenty-eight because they're more likely to have a wider sexual experience." Trial Tr., p. 217. Further, Wilt said that the identification of the perpetrator was medically important so that the medical staff could arrange an alternative placement for the patient in a safer environment where the abuse and injuries were less likely to recur.

privates." [5]  *Id.* at p. 235-36. As to the interaction between S.B. and Leah, Cheney

testified as follows:

> Q: Okay. Was there anything about [Leah's] interaction with [S.B.] that caused you concern that perhaps mom was pressuring the child into saying something?
>
> A: No, there was not.
>
> Q: Okay. Was everything about this contact appropriate in your eyes?
>
> A: Yes.
>
> Q: Okay. Is that something, again, as a health care provider, that you would pay attention to?
>
> A: Yes. *Id.* at p. 239.

{¶48} Dr. Frank Cunningham, the former medical director of the Kids'

Clinic, then testified as an expert witness regarding his examination and diagnosis

of S.B. on November 15, 2011. He recounted that he concluded that S.B.

presented with "a normal exam." *Id.* at p. 256. Dr. Cunningham said that such a

finding was not uncommon for sexual abuse cases: "It's well documented in

medical literature that even in cases of sexual abuse that the exams are normal.

It's more than seventy-five percent of the time of known sexual abuse that we

have normal exams." *Id.* He explained why this occurs commonly as follows:

> There are many different reasons why you could have a normal exam. One may be that the abuse that happened may not be

---

[5] Like Wilt, Cheney similarly testified that these statements were medically necessary to assess S.B.'s injuries and the likelihood of further recurrence.

traumatic enough to cause injury. So, if there's kissing, or touching, or rubbing with a finger, well, there may not be trauma for that enough to leave any kind of sign of damage. Another reason for that is the tissue in this area is very stretchy and it doesn't tear very easy. It's very similar to our lips. So, if you think about your lips, you can pucker your lip or open your mouth really wide and your lip doesn't tear. But, if it does tear, usually it's not very deep and it usually heals pretty quick. The tissue in this area is the same way. So, if it does tear, unless it's very deep, it heals without any scaring. *Id.* at p. 256.

Dr. Cunningham further testified that scarring in a child's anal area is "not very common." *Id.* at p. 257. Based on these principles, Dr. Cunningham testified that "a normal exam itself does not exclude the possibility of sexual abuse." *Id.*

{¶49} Investigator Stoodt then testified as to his role in investigating the allegations against Branch. He indicated that during his interview of S.B., she was able to give "specific" and "very graphic" details of the allegations. *Id.* at p. 271. He further described the detail of S.B.'s statement as follows:

Q: And during the course of the interview and what she told you did [S.B.] indicate a knowledge of sexual activity and sexual acts?

A: Yes, she did.

Q: Did [S.B.] indicate a knowledge of sexual functions especially of the male body?

A: She did.

Q: In your experience in interviewing children of this age is that knowledge that a seven year old would typically have?

A: Not normally; no. *Id.* at p. 272.

Investigator Stoodt also testified as to the search of the Union Street house. The searching officers held up black lights to detect the presence of semen, but none was found in either S.B.'s bedroom or the basement, where the sexual abuse was alleged to have occurred.

{¶50} Detective Miller of the Lima Police Department next testified as to his investigation of the allegations against Branch. Detective Miller said that he approached Branch soon after the booking process to obtain a DNA specimen. At that time, Branch denied any sexual abuse by "sa[ying] something to the effect that the only type of what he considered to be intercourse he had with her was she was constipated and he had checked an injury due to a hardened stool, or something to that effect." *Id.* at p. 295. However, Detective Miller also testified that Branch did make a statement that he considered to be incriminating:

> He made what I thought was a strange statement in that he knew he was going to have to go lay down awhile on this. He was, in my mind, justifying why he did not turn himself in after having seen that we served a search warrant. He said he had another child and there were some things that he wanted to do prior to turning himself in. *Id.* at p. 296.

Detective Miller explained that "lay down" refers to "do[ing] prison time." *Id.* During Detective Miller's testimony, the State played the first interrogation session of Branch. During the first session, Branch generally denied the allegations against him.

{¶51} On cross-examination, Detective Miller discussed the representations made during the first interrogation session. Detective Miller indicated that contrary to the officers' representations, they were permitted to tell Branch about the allegations against him without having him sign a *Miranda* waiver form. Detective Miller also admitted that the officers did not find any physical evidence of sexual abuse, which contradicted the interrogating officers' representations during the first interrogation session.

{¶52} Detective Stechschulte then testified to his role in the investigation of the allegations against Branch. During his testimony, the State played the second interrogation session of Branch for the jury. In this session, Branch admitted to engaging in sexual activity with S.B. In total, Branch admitted to S.B. touching his penis approximately five times and to S.B. putting her mouth on his penis two times. He also admitted that he inserted his penis into S.B.'s anus on one occasion. During the course of these activities, Branch said that he never ejaculated but that he developed pre-cum. Branch additionally indicated that he did not have vaginal sex with S.B. because he wanted to preserve her virginity for her future husband and that he knew his actions were wrong.

{¶53} After Detective Stechschulte's testimony, the trial court received all of the State's exhibits into evidence, including the DVD recordings of Branch's

interrogation sessions. The State then rested. Branch moved for acquittal under Crim.R. 29, but the trial court denied the motion.

{¶54} Branch's first witness was Margaret Oen. Oen testified that she first made contact with Branch and Leah in her capacity as an employee for a non-profit group that focuses on finding employment for young people. Oen said that she developed a personal relationship with Branch, Leah, and their children soon after Branch and Leah left the program she administered for the non-profit. She testified that Branch was "very loving and very caring" with his children. Trial Tr., p. 351. Oen also indicated that Leah intimidated her children by placing a belt over her lap. Oen further testified that Leah's reputation was "[t]hat she isn't always the most truthful person. In fact, a lot of times she lies." *Id.* at p. 354.

{¶55} Suzanna Ramsey, Branch's sister, then testified. She said that during her extensive interaction with S.B., she never noticed any sign that S.B. was suffering any sexual abuse. Ramsey also testified as follows regarding Leah's reputation: "I mean, it's just like Leah's reputation, I mean, she lies. She lies and she knows how to manipulate people. She know [sic] how to. She can put on her tears. She can stop them whenever she gets ready." *Id.* at p. 369.

{¶56} Tiffany Glenn, Branch's "best friend" and the mother of one of Branch's children, was the next witness to testify. *Id.* at p. 371. She indicated that

Branch has "a good reputation. He's an honest person." *Id*. at p. 372. Glenn also indicated that she saw no signs that S.B. was being abused.

**{¶57}** Betty Branch, Branch's mother, was the next witness called to the stand. She testified that she saw no signs that S.B. was sexually abused.

**{¶58}** Branch testified on his own behalf. He denied all of S.B.'s allegations as follows:

> Q: Okay. I'm going to look you in the eye and I'm going to ask you, Cleveland, did you ever, ever, touch your daughter, [S.B.], in a sexual way?
>
> A: No, sir.
>
> * * *
>
> Q: * * * Did you ever have [S.B.] touch your penis?
>
> A: No, sir.
>
> Q: Ever at any time?
>
> A: No, sir.
>
> * * *
>
> Q: Has your daughter, [S.B.], ever performed oral sex on you?
>
> A: No, sir.
>
> Q: Has she ever put her mouth to your penis?
>
> A: No, sir.
>
> Q: Have you ever touched your daughter with your penis anywhere?

-31-

A: No, sir.

Q: You heard your daughter's testimony, Cleveland –

A: Yes, I did.

Q: - that you put your penis in her rectum, in her butt, did you hear that testimony?

A: Yes. Yes.

Q: Is that true?

A: No, sir. *Id*. at p. 392-94.

{¶59} Branch testified that he thought Leah was behind the allegations against him. He indicated that Leah's motive for concocting the allegations was out of jealousy over Branch's relationship with Glenn. Branch also testified that he told Leah that he was prepared to leave her. He further described Leah as having a pattern of making false allegations against him.

{¶60} As to his relationship with S.B., Branch said he was rarely alone with S.B. He said that Leah was primarily responsible for nurturing the children, especially S.B. And, according to Branch, when Leah was at work, S.B. was usually placed in Ramsey's care as opposed to his.

{¶61} Branch testified that he made false statements when the police interrogated him. He said that he "lost it" and "didn't care anymore at the time." *Id*. at p. 458. Branch further indicated that he decided to confess to the allegations

because of Detective Leland's representation that confessing would lead to a shorter jail term and less emotional stress for S.B. He also suggested that his multiple sclerosis contributed to his faulty reasoning process during the interrogation. Branch testified that he based his false statements during the interrogation on his previous sexual experiences with Leah and other women.

{¶62} On cross-examination, Branch testified that he and Leah attended church and counseling services to improve their relationship. Nevertheless, Branch declined to say that these activities disproved his claim that Leah was behind S.B.'s allegations:

> Q: Okay. But, in terms of [Leah], what I was just asking you about, in terms of returning to the relationship, trying to make it work, going to church with you, attending counseling, would you agree with me that that's a little at odds with your claim that she was always out to get you in trouble? Yes or no.
>
> A: I wouldn't agree with you; no. * * * 'Cause I was the one trying to make things better. *Id.* at p. 471.

Branch also acknowledged that it had been four years since he had been involved with the police as a suspect or defendant, which led to the following exchange:

> Q: So, would you agree with me that that's a bit inconsistent with your claim that Leah was always picking up the phone and calling the police and having you hauled off to jail?
>
> A: In-between times there was leaving, her leaving and stuff like that, and she wouldn't, 'cause she promised she wouldn't do that anymore.

-33-

Q:  Mr. Branch, I'm not asking about Leah leaving.  I was asking whether the fact that you've had no police contact since 2008 was inconsistent with your claim that Leah was always picking up the phone and calling the police and having you hauled off to jail.

A:  Well, I didn't say always.  I just said in times like when we would get into it – well, she agreed after that she wouldn't do it again.  So, we'd just leave.

Q:  So, what you're saying is that when there were problems Leah would remove herself from the situation, but she would not actually phone the police and make a complaint?

A:  She would, and I would.  I would leave or she would leave.

Q:  But, none of that has happened since 2008 in terms of making any kind of complaint; correct?

A:  Yes.  *Id*. at p. 477-78.

{¶63} In regard to Branch's activities on November 9 and 10, 2011, he testified that he left the family residence because he thought that the police would go to the house to execute a search.  Branch further testified about his actions as follows:

Q:  And then although [Detective Stechschulte] encouraged you to turn yourself in, you declined to do so; is that correct?

A:  Yes.

Q:  And then when the police showed up at your mom's house shortly thereafter you told your mother to lie to the police and say that you weren't there?

A:  Yes.

Q: But, yet, it's your testimony that you weren't running, or hiding, or trying to dodge the police?

A: I wasn't running.

Q: How about hiding or trying to dodge the police?

A: Dodge them. If you want to say that, yea, because I wanted to have an attorney when I talked to them.

Q: But, yet, you already testified that you did not call an attorney during that approximate two day span; is that correct?

A: Yea, 'cause * * * I didn't think I needed one at the time. *Id.* at p. 485-86.

{¶64} Additionally, Branch confirmed several basic facts of the case as follows:

Q: And is your daughter, [S.B.], currently eight years old?

A: Yes.

* * *

Q: And you have never been married to your daughter, [S.B.], have you?

A: No.

* * *

Q: And specifically are you the person on the DVD admitting to having your daughter touch your penis on five occasions?

A: Yes.

Q: And specifically are you the person on the DVD admitting to having put your penis in your daughter's mouth on two occasions?

A:    Well, I didn't say I did it.

Q:    Oh, that's right.  You said that she did it.  But, in fact, are you the person admitting that your daughter put her mouth to your penis on two occasions?

A:    Yes.

Q:    Okay.  Then, specifically, are you the person on the DVD admitting to penetrating your daughter's anus with your penis on one occasion?

A:    Yes.  *Id*. at p. 500-02.

{¶65} After Branch's testimony, the defense rested.  Branch renewed his Crim.R. 29 motion for acquittal, which the trial court again denied.  Both the State and Branch offered their closing statements and the trial court charged the jury before deliberations.

{¶66} On October 5, 2012, the jury returned guilty verdicts on all eight counts alleged in the indictment.  This matter then proceeded to sentencing on that same day.  After hearing evidence and argument relating to the issue of punishment, the trial court imposed sentence as follows: (1) 15 years to life in prison for each of the three counts of rape; and (2) 60 months in prison for each of the five counts of gross sexual imposition.  The trial court further ordered that each prison term run consecutively.  As such, the trial court imposed a total prison term of 70 years to life.  On October 9, 2012, the trial court issued a judgment entry journalizing Branch's conviction and sentence.

{¶67} Branch timely appealed this judgment, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN FAILING TO SUPPRESS STATEMENTS MADE DURING POLICE INTERVIEWS, AS THE DEFENDANT HAD INVOKED HIS FIFTH AMENDMENT RIGHT TO COUNSEL.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED IN FINDING THE CHILD VICTIM COMPETENT TO TESTIFY.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENDANT ACCESS TO AND/OR ALLOWING THE DEFENDANT TO ASK QUESTIONS REGARDING RECORDS FROM CHILDREN SERVICES BOARD FILES.**

*Assignment of Error No. IV*

**THE TRIAL COURT ERRED IN PERMITTING ANOTHER PERSON TO SIT WITH THE ALLEGED VICTIM WHILE THE VICTIM WAS TESTIFYING.**

*Assignment of Error No. V*

**THERE WAS INSUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT.**

*Assignment of Error No. VI*

**THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. VII*

**THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.**

*Assignment of Error No. I*

**{¶68}** In his first assignment of error, Branch argues that the trial court erred by denying his motion to suppress the statements he made during the police interrogations. Specifically, Branch contends that he invoked his right to counsel before and during the interrogation sessions, rendering the police's continued questioning of him unconstitutional. We disagree.

*Standard of Review*

**{¶69}** "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the witnesses' credibility and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside* at ¶ 8.

Miranda*'s Protections*

**{¶70}** The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *." This provision is applicable to the states via the due process clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489 (1964). The United States Supreme Court has interpreted the Fifth Amendment as bestowing certain rights upon criminal suspects that are subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602 (1966). These rights include the right to remain silent and the right to have counsel present during the interrogation. *Id.* Once a suspect invokes these rights during an interrogation, all further questioning "must cease and may not be resumed in the absence of counsel unless the [suspect] thereafter [executes] a valid waiver or himself renews communication with police." *State v. Knuckles*, 65 Ohio St.3d 494 (1992), paragraph one of the syllabus. This rule applies even where the suspect executed a *Miranda* waiver before invoking his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880 (1981).

**{¶71}** A merely "ambiguous or equivocal" invocation of the right to counsel does not dictate that police officers halt their questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994). As a result, Ohio courts have found that the following statements are insufficient to invoke the right to counsel:

(1)  "[W]hen I talk to my lawyer," *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, ¶ 95;

(2)  "[D]on't [sic] I supposed to have a lawyer present[?]" *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, ¶ 19;

(3) "I think I need a lawyer," *State v. Henness*, 79 Ohio St.3d 53, 62 (1997);

(4)  "I would prefer a lawyer but I want to talk to you now," *State v. Carr*, 1st Dist. No. C-090109, 2010-Ohio-2764, ¶ 18; and

(5)  "Well, I'm going to need [an attorney]," *State v. Tefft*, 3d Dist. No. 1-99-30 (Sept. 2, 1999).

*See also State v. Ward*, 3d Dist. No. 9-99-39 (Dec. 2, 1999) (collecting cases). Rather, for a proper invocation of rights, "the suspect must unambiguously request counsel." *Davis* at 459. This means that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. As suggested by the plain terms of the test, this inquiry is objective and does not rely on the subjective beliefs of the defendant or the interrogating officers. *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 57 (2d Dist.).

{¶72} Here, the record reveals the following evidence that suggests an invocation of counsel on Branch's part: (1) Branch's testimony that he requested

an attorney before both of the interrogation sessions started; (2) Branch's statement during the first interrogation session that he did not turn himself in earlier because he was seeking a lawyer; (3) Branch's statement during the first interrogation session that he watched cop shows and his description of those shows as suggesting that suspects should have lawyers present during questioning; and (4) Branch's statement during the first interrogation session that he would take a lie detector test if he had counsel. We find that none of this evidence demonstrates that Branch made an unambiguous request for counsel and as such we find no *Miranda* violation.

{¶73} In regard to the first item of evidence, the trial court found that Branch's testimony that he requested an attorney was incredible. The trier of fact is granted wide latitude in credibility determinations and we are precluded from disturbing credibility findings unless they are unsupported in the record. *State v. Hillman*, 10th Dist. Nos. 06AP-1230, 07AP-728, 2008-Ohio-2341, ¶ 29. Here, all of the detectives involved in the booking and interrogation of Branch testified that he did not request an attorney. Moreover, the DVD recordings do not capture any of Branch's purported requests for an attorney. Since there is no corroboration of Branch's self-serving testimony and since the interrogating officers' testimony directly contradicts Branch's testimony, we are unable to find that the trial court erred in finding that Branch was not credible. Consequently, we find that

Branch's testimony that he requested an attorney does not establish the invocation of his right to counsel.

**{¶74}** As to the second, third, and fourth items of evidence, we find that Branch's statements fall into the above ambit of cases where the suspect's statements do not constitute an unambiguous request for counsel. Branch's statements essentially indicate that before his interrogation he attempted to obtain counsel and that he believed it would be better to have counsel in the future. These statements would not sufficiently inform reasonable police officers that Branch was invoking his right to counsel. *See Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, at ¶ 58 (finding that suspect's statement that "'if you're trying, you know, to get me in trouble, I'm gonna talk to a lawyer'" constituted an "expression of a conditional, future intent to talk to a lawyer," not an invocation of counsel); *State v. Metz*, 4th Dist. No. 96 CA 48 (Apr. 21, 1998) (finding that suspect's statement that "[m]aybe I should talk to an attorney'" was not an invocation of the right to counsel since it "indicates a concern whether the accused should speak with an attorney" and is not a "clear assertion[] of the right to counsel"). Indeed, there was no explicit statement that Branch wanted counsel or that he would not continue the interrogation without counsel present. *See State v. Adams*, 7th Dist. No. 08 MA 246, 2011-Ohio-5361, ¶ 57 (finding no invocation of right to counsel where suspect "did not specifically express a desire to speak only

through counsel"). As a result, we find that Branch did not invoke his right to counsel during the course of the interrogation sessions.

{¶75} In sum, we are unable to find that the record supports Branch's argument that he unequivocally invoked his right to counsel either before or during the interrogation sessions.[6]

{¶76} Accordingly, we overrule Branch's first assignment of error.

### Assignment of Error No. II

{¶77} In his second assignment of error, Branch argues that the trial court erred in finding that S.B. was competent to testify at trial. Specifically, Branch contends that S.B.'s responses during the trial court's voir dire examination that she could not remember what it means to tell a lie and that she could not recall the date of her family's trip to Detroit show she was incompetent. We disagree.

### Standard of Review

{¶78} A trial court's ruling pursuant to Evid.R. 601 is reviewed for an abuse of discretion. *State v. McClellan*, 3d Dist. No. 1-09-21, 2010-Ohio-314, ¶ 49. A trial court abuses its discretion when its decision is contrary to law, unreasonable, unsupported in the record, or grossly unsound. *State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 16-18. When applying abuse of discretion review, the appellate court is precluded from substituting its own judgment for that

---

[6] We also find Branch's claim that he did not fully understand his rights has a dubious factual basis. The waiver and admonishment form, as well as his significant discussion with the interrogating officers about his rights, are strong evidence that Branch did indeed understand his rights and waived them.

of the trial court. *McClellan* at ¶ 49. This deferential standard of review is particularly appropriate for a trial court's determination of a child witness's competency since it had the opportunity to "observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully." *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991).

*Evid.R. 601*

{¶79} Evid.R. 601 governs the competency of witnesses who may testify at trial. It provides, in pertinent part, as follows:

> Every person is competent to be a witness except:
>
> (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly. Evid.R. 601(A).

Under Evid.R. 601(A)'s plain terms, "the competency of individuals ten years or older is presumed, while the competency of those under ten must be established" by the proponent of the witness's testimony. *State v. Clark*, 71 Ohio St.3d 466, 469 (1994). Regardless of the child witness's age, "[t]he rule favors competency." *Turner v. Turner*, 67 Ohio St.3d 337, 343 (1993). In determining whether a child is competent to testify under Evid.R. 601(A), a trial court must consider the following factors: "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect

-44-

those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity, and (5) the child's appreciation of his or her responsibility to be truthful." *State v. Brock*, 3d Dist. No. 5-07-42, 2008-Ohio-3220, ¶ 51, quoting *Frazier* at 251.

**{¶80}** Here, during the trial court's interview of S.B., she indicated that she knew her address, her school, her church, how to read and write, and the names of her school teachers. She also said that she knew the difference between truthful statements and lies and that she would not lie even if someone asked her to do so. Moreover, S.B. correctly identified truthful statements and untruthful statements. Even more critically, S.B. articulated her knowledge that she had to tell the truth at trial and that she would get into trouble if she lied. In light of this evidence, we are unable to find that the trial court's ruling is unsupported by the record or amounts to an abuse of discretion. *See State v. Petaway*, 3d Dist. No. 8-08-22, 2009-Ohio-1304, ¶ 29-31 (finding that children were competent to testify at trial where they indicated their knowledge of the distinction between truthful statements and lies, the possibility of punishment for lying, and the importance of testifying truthfully at trial).

**{¶81}** On appeal, Branch identifies two items of evidence as suggesting that S.B. was not competent to testify. He first identifies S.B.'s failure to articulate a definition of a lie as showing her incompetence. While this failure does tend to

suggest incompetence, it is not fatal to the trial court's ruling here. The trial court properly considered the totality of the evidence before it and decided that the evidence discussed above deserved greater weight than this isolated deficiency. Based on S.B.'s indication that she knew the difference between truth and falsehood, her correct identification of truthful and untruthful statements, and her knowledge of the importance of truthful testimony, we can find no error in this decision.

**{¶82}** Branch also suggests that S.B.'s failure to remember the dates of her family's trip to Detroit renders her incompetent. This argument, however, is not supported in the record. Rather, the record reflects that S.B. was able to identify the trip as occurring in "August or September" of the last year she was living with Branch. Aug. 15, 2012 Tr., p. 12. Thus, this argument has no basis and does not suggest that the trial court abused its discretion.

**{¶83}** Accordingly, we overrule Branch's second assignment of error.

*Assignment of Error No. III*

**{¶84}** In his third assignment of error, Branch argues that the trial court erred in denying him access to Allen County Child Services records regarding Leah and the children in the Branch household. We disagree.

**{¶85}** This assignment of error implicates Crim.R. 16(B)(5), which states that a criminal defendant is entitled to the discovery of evidence that is "favorable

to the defendant and material to either guilt or punishment." In cases involving child services records, this requirement comes into conflict with the confidentiality that attaches to such records pursuant to R.C. 2151.421(H)(1) and R.C. 5153.17. *Johnson v. Johnson*, 134 Ohio App.3d 579, 583 (3d Dist. 1999). The United States Supreme Court has resolved this conflict by holding that a defendant's due process right to a fair trial entitles him to an in camera inspection by the trial court of confidential child services records to assess whether they contain evidence that is material to the defendant's guilt. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 107 S.Ct. 989 (1987). We have further defined the rule announced in *Ritchie* as follows:

> [A] court may conduct an in camera inspection of child-abuse records or reports and also has the *inherent power* to order disclosure of such records or reports where (1) the records or reports are relevant to the pending action, (2) good cause for such a request has been established by the person seeking disclosure, and (3) where admission of the records or reports outweigh the confidentiality considerations set forth in R.C. 5153.17 and R.C. 2151.421(H)(1). (Emphasis sic.) *Johnson* at 585.

{¶86} Based on our review of the child services records, we are unable to find that they are relevant to this matter or that their disclosure to Branch outweighed the confidentiality considerations of R.C. 5153.17 and R.C. 2151.421(H)(1). There are no records indicating that Leah had made past false abuse allegations against Branch or that Leah had manipulated S.B. into disclosing

her allegations. Additionally, the only records that related to the November 2011 disclosure of S.B.'s allegations were turned over to Branch.

{¶87} Further, Branch proffered that the records would establish that Leah intimidated Branch's children, physically disciplined them, and made false allegations against Branch. Even if the records did this, the trial court's denial of access was harmless since Branch introduced other evidence at trial that tended to establish these facts. Oen, who was called as Branch's witness, testified that Leah intimidated the children by placing her belt on her lap and that Leah had a negative reputation in the community regarding her truthfulness. Ramsey similarly testified that Leah was untruthful and manipulative. Moreover, Branch testified on his own behalf that Leah had previously made false accusations to the authorities that he had physically abused both her and the children.

{¶88} Based on the foregoing, we are unable to find that the trial court erred in denying Branch access to the child services records.

{¶89} Accordingly, we overrule Branch's third assignment of error.

*Assignment of Error No. IV*

{¶90} In his fourth assignment of error, Branch asserts that the trial court erred in permitting Pastor Vonderau to sit with S.B. during her testimony. We disagree.

{¶91} We review a trial court's ruling under Evid.R. 611 for an abuse of discretion. *State v. Bump*, 3d Dist. No. 8-12-04, 2013-Ohio-1006, ¶ 88.

{¶92} Evid.R. 611(A)(3) allows trial courts to "exercise reasonable control over the mode and order of interrogating witnesses" in order to "protect witnesses from harassment or undue embarrassment." When applying Evid.R. 611(A)(3), trial courts should "recognize that the protection of child victims of sexual abuse forms an important public policy goal in this state and across the nation." *State v. Eastham*, 39 Ohio St.3d 307, 310 (1988). As a result of this public policy goal, we have noted that "[s]pecial accommodations/procedures are often allowed for child victims of sexual abuse to minimize the emotional trauma and stress of having to testify in a courtroom full of strangers, along with the accused." *State v. Gutierrez*, 3d Dist. No. 5-10-14, 2011-Ohio-3126, ¶ 100 (collecting cases).

{¶93} We can find no error in the trial court's decision to allow Pastor Vonderau to sit next to S.B. as she testified. This matter presents a similar fact pattern as the one addressed in *State v. Johnson*, 38 Ohio App.3d 152 (5th Dist. 1986). There, the child witness, an alleged victim of rape, testified while sitting in her aunt's lap. The Fifth District found that such an action did not violate Evid.R. 611 since it was a "reasonable control" over the interrogation process. *Id*. at 154. Allowing S.B. to sit next to Pastor Vonderau is also a reasonable control since it served the critical public policy goal of comforting S.B. and reducing the stress

inherent in such an emotionally traumatic case. Further, according to the trial court's statement, Pastor Vonderau did nothing during S.B.'s testimony except to move the microphone closer to her. Finally, Pastor Vonderau's presence did not prevent Branch from confronting and cross-examining S.B. about her testimony.

{¶94} Accordingly, we overrule Branch's fourth assignment of error.

*Assignment of Error No. V*

{¶95} In his fifth assignment of error, Branch argues that the State did not present sufficient evidence to support his convictions. We disagree.

*Sufficiency Standard*

{¶96} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. No. 26443, 2013-Ohio-2079, ¶ 4.

*Branch's Rape Convictions*

**{¶97}** R.C. 2907.02(A)(1)(b) states, in relevant part, as follows: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The Revised Code defines "sexual conduct" as "anal intercourse [and] fellatio * * * between persons regardless of sex; and without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." R.C. 2907.01(A). Further, "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id.* R.C. 2907.02(A)(1)(b) is Ohio's statutory rape provision and it imposes strict liability upon an offender who has sexual conduct with children under the age of 13. *See In re D.B.*, 129 Ohio St.3d 104, 2011-Ohio-2671, ¶ 30 ("The plain language of the statute makes it clear that every person who engages in sexual conduct with a child under the age of 13 is strictly liable for statutory rape, and the statute must be enforced equally and without regard to the particular circumstances of an individual's situation."). As such, neither the offender's mental state, *State v. Freeman*, 8th Dist. No. 92809, 2010-Ohio-3714, ¶ 29, nor the victim's consent, *In re D.R.*, 7th Dist. No. 12 MA 16, 2012-Ohio-5341, ¶ 24, are material to a defendant's guilt under the statute. Consequently, R.C. 2907.02(A)(1)(b) only has three relevant elements: (1) the victim was not the

offender's spouse; (2) the victim was under the age of 13 at the time of the sexual conduct; and (3) the offender engaged in sexual conduct with the victim.

{¶98} Here, Branch himself, through his statements during the police interrogation that was played for the jury and his testimony at trial, provided the necessary sufficient evidence to support his convictions under R.C. 2907.02(A)(1)(b). At trial, Branch testified that S.B. was not his spouse and he testified that she was eight years old at the time of trial and that she was under the age of 13 years during the time period alleged in the indictment. This testimony satisfies the first two elements of R.C. 2907.02(A)(1)(b).

{¶99} Meanwhile, Branch's admissions during the police interrogation were sufficient to satisfy the third element. During the interrogation, Branch admitted that he engaged in anal intercourse once with S.B. He specifically said that he inserted his penis one-quarter of an inch into S.B.'s anus, which satisfies the slight penetration requirement for the statutory definition of sexual conduct. Additionally, Branch admitted during the interrogation that S.B. performed oral sex on him twice, which included her putting the tip of his penis into her mouth. This activity constitutes fellatio and sexual conduct as that term is defined in R.C. 2907.01(A).

Case No. 1-12-44

{¶100} In sum, Branch's testimony and his own admissions during the police interrogation were sufficient by themselves to support his three convictions under R.C. 2907.02(A)(1)(b).

*Branch's Gross Sexual Imposition Convictions*

{¶101} R.C. 2907.05(A)(4) criminalizes gross sexual imposition and provides, in pertinent part, as follows: "No person shall * * * cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of the person." The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation, the thigh, genitals, buttock, pubic region, or, if the person is female, a breast, for the purpose of sexual arousing or gratifying either person." R.C. 2907.01(B). Although R.C. 2907.05(A)(4) itself does not contain any language indicating a requisite mental state, the Supreme Court of Ohio has supplied an applicable culpability of purpose based on its readings of the statute in conjunction with R.C. 2907.01(B)'s definition of sexual contact. *State v. Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111, ¶ 26. Thus, for criminal liability to attach, a defendant must act purposefully when engaging in the alleged sexual contact. However, by R.C. 2907.05(A)(4)'s plain terms, the victim's age is a strict liability element of the offense and the defendant's mental state as to that element is

-53-

immaterial. *Id*. at ¶ 18. Consequently, the elements necessary for a gross sexual imposition conviction are as follows: (1) the victim was not the offender's spouse; (2) the victim was under the age of 13 at the time of the sexual contact; and (3) the offender purposefully engaged in sexual contact with the victim.

{¶102} As with Branch's rape convictions, Branch himself provided the sufficient evidence necessary to convict him of gross sexual imposition. His testimony at trial that S.B. was not his wife and that she was eight years old at the time of the trial established the first two elements of the offense. Meanwhile, Branch's admissions during his interrogation that S.B. touched his penis on five occasions satisfied the fourth element of gross sexual imposition. Finally, the purposeful mental state requirement is satisfied by Branch's statements during the interrogation that he knew that his actions were wrong, that he abstained from vaginal sex with her because of his desire to preserve S.B.'s virginity, and that he became erect and developed pre-cum while S.B. touched his penis.

{¶103} Based on Branch's testimony at trial and his statements during the police interrogation, we find that there was sufficient evidence in the record to support all five of Branch's gross sexual imposition convictions.

{¶104} Accordingly, we overrule Branch's fifth assignment of error.

*Assignment of Error No. VI*

**{¶105}** In his sixth assignment of error, Branch contends that his convictions were against the manifest weight of the evidence. Specifically, he contends that the lack of physical evidence, medical evidence, and eyewitness testimony from someone other than S.B. renders his convictions against the manifest weight of the evidence. We disagree.

*Standard of Review*

**{¶106}** Although we have concluded that there was sufficient evidence to support Branch's convictions, our finding in that regard does not foreclose the possibility that the convictions were against the manifest weight of the evidence. *See Thompkins*, 78 Ohio St.3d at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the manifest weight of the evidence."). When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Id.* Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1989). When

applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

*Recapitulation of Evidence*

{¶107} Here, S.B. explicitly testified that she would touch Branch's penis and that he put his penis in her mouth and anus. Indeed, she graphically described the sexual activity and how Branch's penis would emit "white stuff.". Investigator Stoodt testified that the level of detail in S.B.'s allegations was quite unusual for a person of her young age, which adds greater credibility to her testimony. *See Bump*, 2013-Ohio-1006, at ¶ 44 (finding harmless error in admission of evidence since the child sex abuse victims' testimony, which included child's description of "white stuff" coming from the defendant's penis, was detailed and graphic and alone supported trial court's finding of guilt on sex offenses). Further, Leah's testimony that she never performed oral sex on Branch in front of S.B. and her denial that there was an incident at school where S.B. saw a boy's penis bolsters the view that S.B. could only have obtained the necessary detail for her allegations by engaging in sexual activity with Branch.

{¶108} Branch's own confession during the interrogation tends to corroborate S.B.'s allegations. He admitted to having S.B. touch his penis five times, to her performing oral sex on him twice, and to putting his penis in her anus

on one occasion. At trial, Branch said his confession was untrue and that he was coerced into giving the incriminating statements during the interrogation. However, in light of the inconsistencies in Branch's explanation that Leah was behind S.B.'s allegations and his testimony that he attempted to "dodge" the police, we find his testimony to be incredible. For the same reasons, we decline to give credence to Branch's denial of the allegations at trial, especially since the jury clearly disbelieved him. *See State v. Clark*, 101 Ohio App.3d 389, 409 (8th Dist. 1995) ("It is well established that the * * * credibility of witnesses [is] primarily [a] matter[] for the trier of fact."). Further, we note that there was testimony that Branch had the opportunity to engage in sexual activity with S.B. since there were times he was alone with the child, which again supports his convictions. *Bump* at ¶ 44.

{¶109} Branch's theories to support his innocence were likewise disproven by contrary testimony at the trial. While Leah and Branch did have a tumultuous marriage, they testified that they were trying to work out their issues before S.B.'s disclosure of the allegations. Based on this, it is questionable whether Leah would take the dramatic step of manipulating S.B. to lie and make false accusations against Branch. Also, both Cheney and Wilt testified that when they heard S.B. make the allegations, they did not suspect that Leah was manipulating S.B. Meanwhile, in regard to Branch's testimony that his multiple sclerosis contributed

to his purportedly flawed reasoning during the interrogation, Leah testified to the contrary that the condition did not cause Branch to suffer from amnesia or to black out. As such, we do not find that the record overwhelmingly supports Branch's factual defenses over the evidence supporting his convictions.

*Branch's Arguments*

{¶110} Branch's arguments are similarly unavailing. The lack of physical and medical evidence to corroborate S.B.'s allegations is not fatal here since such evidence is not required to sustain a sex offense conviction. *E.g.*, *State v. Sauto*, 9th Dist. No. 26404, 2013-Ohio-1320, ¶ 45-47 (rejecting manifest weight of the evidence challenge of unlawful sexual contact with a minor conviction that was partially predicated on lack of physical evidence). The lack of such evidence in this matter is especially immaterial since Dr. Cunningham testified that his findings did not exclude the possibility of sexual abuse. Moreover, the lack of corroborating eyewitness testimony is similarly not a basis for reversal of Branch's convictions since Branch's own admissions during the interrogation corroborate S.B.'s allegations, as discussed above.

{¶111} In sum, based on our review of the record, we are unable to find that Branch's convictions are against the manifest weight of the evidence.

{¶112} Accordingly, we overrule Branch's sixth assignment of error.

*Assignment of Error No. VII*

{¶113} In his seventh assignment of error, Branch claims he was denied the effective assistance of counsel. Specifically, he asserts that his trial counsel's statements indicate a lack of preparation. We disagree.

*Ineffective Assistance of Counsel Standard*

{¶114} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there is a reasonable probability that but for counsel's errors, the outcome at trial would have been different. *Id*. at paragraph three of the syllabus. "Reasonable probability" refers to a probability that is sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), superseded by constitutional amendment on other grounds as stated in *Smith*, *supra*. In assessing trial counsel's performance, we must consider "the totality of the circumstances and not isolated instances of an allegedly deficient performance." *State v. Wilson*, 3d Dist. No. 1-09-53, 2010-Ohio-2947, ¶ 12.

{¶115} Here, Branch points to the following statements by his trial counsel as indicating ineffective assistance:

(1) "I don't profess to be one-tenth as book smart as either one of the prosecutors in this case," and "I don't know the law as well as you [the prosecutor] do," Trial Tr., p. 140;

(2) "[Branch] is going to testify. I'm not going to tell you what he's going to say because, frankly, I don't know," *id.* at p. 40; and

(3) "I'm going to put some witnesses on the stand. I don't even know what they're going to say, to be honest with you," *id.* at p. 45.

Branch also suggests that the State's motion regarding trial counsel's "on-going and blatant disregard to the boundaries set by law for his conduct" suggests ineffective assistance. *Id.* at p. 125. However, we find that none of these items gives rise to an ineffective assistance of counsel claim.

*Trial Counsel's Knowledge in Comparison to Opposing Counsel*

{¶116} A criminal defense attorney's professed limited knowledge of law in relation to the prosecutor's does not suggest ineffective assistance of counsel. Criminal defendants are entitled to competent counsel; not counsel that is necessarily better than the prosecutors. *See Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012) (stating that defendants are "entitled to the effective assistance of *competent* counsel"); *State v. Ransey*, 6th Dist. No. L-96-257 (Jan. 16, 1998) ("It is well established that the constitution does not guarantee * * * the best available defense. The Sixth Amendment * * * requires only that defense counsel perform

at least as well as an attorney with ordinary training and skill in criminal law."). Here, Branch's trial counsel ably argued several pre-trial motions, including the motion to suppress and the motion regarding S.B.'s competency to testify at trial. Further, he vigorously cross-examined many of the State's witnesses. Simply put, the record does not reflect that trial counsel was incompetent to handle Branch's defense.

*Trial Counsel's Preparation*

{¶117} We have consistently noted that "[d]ebatable trial tactics" do not provide sufficient grounds for a finding of ineffective assistance of counsel. *E.g.*, *State v. Newsome*, 3d Dist. No. 12-12-03, 2012-Ohio-6119, ¶ 50. Indeed, the United States Supreme Court has proclaimed that trial counsel's "strategic decisions * * * are *virtually unchallengable*." (Emphasis added.) *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527 (2003). Here, we find that trial counsel's statements that he did not know what Branch's witnesses would say on the stand constituted a trial tactic that is not amenable to our second-guessing. To bolster the credibility of his witnesses, Branch's trial counsel asked several of them whether he had rehearsed their testimony with them. This was a legitimate tactic that was designed to help Branch's defense and we cannot find that trial counsel was ineffective for deciding to employ it.

*State's Motion*

**{¶118}** We are unable to find that the State's motion suggests any form of ineffective assistance. There is no indication that trial counsel's statements to the jury regarding racial composition, the possibility for punishment, or the credibility of witnesses harmed Branch's defense. Indeed, while such statements are improper, they benefit Branch, which is why the State moved to exclude them. As such, we are unable to find that trial counsel's conduct that gave rise to the State's motion prejudiced Branch.

**{¶119}** In sum, we are unable to find that Branch's trial counsel provided ineffective assistance of counsel.

**{¶120}** Accordingly, we overrule Branch's seventh assignment of error.

**{¶121}** Having found no error prejudicial to Branch in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**PRESTON, P.J. and SHAW, J., concur.**

**/jlr**